# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| B.B., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 20-2467 (CKK) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

## MEMORANDUM OPINION
(March 21, 2022)

Plaintiffs B.B., a student eligible for special education services in the District of Columbia, and his mother (collectively "Plaintiffs")[1] filed a complaint seeking judicial review of a Hearing Officer's Determination ("HOD"),[2] ECF No. 11-1, at 10-31, following an administrative due process hearing under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.  See* Complaint for Declaratory and Injunctive Relief, ECF No. 1.

Presently before this Court are Plaintiffs' [23] Motion for Summary Judgment and

---

[1] Plaintiffs and Defendant were referred to as Petitioners and Respondent by the Hearing Officer but will be referred to as Plaintiffs and Defendant herein.

[2] The Hearing Officer's Determination was "corrected" to make typographical or grammatical changes and to remove personally identifiable information.  The Court refers to the corrected HOD herein.

Defendant District of Columbia's [24] Cross Motion for Summary Judgment.[3]  Plaintiffs allege a denial of free appropriate public education, and they seek reimbursement for Plaintiff B.B.'s tuition at the Lab School for School Year 2019-2020.   Upon consideration of the parties' pleadings,[4] the relevant legal authorities, and the record as a whole, the Court shall **DENY** Plaintiffs' [23] Motion for Summary Judgment and **GRANT** Defendant's [24] Cross Motion for Summary Judgment.  A separate Order accompanies this Memorandum Opinion.

## I. BACKGROUND

### A. Statutory Framework

The Individuals with Disabilities Education Act ("IDEA") was enacted to "ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare

---

[3] While Defendant District of Columbia (the "District") encompasses the District of Columbia Public Schools ("DCPS"), the term DCPS is sometimes used herein. "Although motions for review of an HOD are called motions for summary judgment, the court does not follow 'a true summary judgment procedure'" *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 128 (D.D.C. 2018) (quoting *L.R.L. ex rel. Lomax v. Dist. of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012)). In a civil action brought to challenge a Hearing Officer's determination pursuant to the IDEA, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the court may receive." *D.R. v. Govt. of the Dist. of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009).  The motion for summary judgment is "the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.G. v. Dist. of Columbia,* 246 F. Supp. 3d 1, 8 (D.D.C.  2017) (citations omitted).

[4] The Court's consideration has focused on the following materials: Plaintiffs' Motion for Summary Judgment, and Memorandum in support thereof, and Statement of Undisputed Material Facts ("Pls.' Mot."), ECF No. 23; District of Columbia's Opposition and Cross Motion for Summary Judgment ("Def.'s Cross-Mot."), ECF No. 24; Plaintiffs' Opposition to Defendant's Cross Motion and Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Pls.' Reply"), ECF No. 29; Defendant's Reply to Plaintiff's Opposition to Defendant's Cross Motion ("Def.'s Reply"), ECF No. 32; and the record in this case, including the Administrative Record ("AR"). In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

them for further education, employment, and independent living." *M.G. v. Dist. of Columbia*, 246 F. Supp. 3d 1, 7 (D.D.C. 2017) (citing 20 U.S.C. § 1400(d)(1)(A)); *see also Boose v. Dist. of Columbia*, 786 F. 3d 1054, 1056 (D.C. Cir. 2015)).  Once a child is identified as disabled, the school district must develop an individualized education program ("IEP") for the student.  *See* 20 U.S.C. § 1414 (d)(1)(A) & (d)(2)(A).

The IEP "is the centerpiece of the statute's education delivery system for disabled children[.]" *Endrew F. v. Douglas County School Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (citation omitted).  An IEP must include a variety of information, including the child's current levels of academic achievement and functional performance, measurable annual goals, how the child's progress towards the goals will be measured, and the special education and related services to be provided to the child. 20 U.S.C. § 1414(d)(1)(A)(I).  The IEP must be formulated in accordance with statutory requirements that emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances.  20 U.S.C. § 1414(d)(1)(B); *see also* § 1415(b)(1) (the IDEA guarantees parents of disabled children the opportunity to participate in the evaluation and educational placement process).  "An IEP must aim to enable the child to make progress; the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Endrew F.*, 137 S. Ct. at 992.  Furthermore,  that "the degree of progress contemplated by the IEP must be appropriate in light of the child's circumstances [ ] should come as no surprise [as] [t]his reflects the focus on the particular child [that] is at the core of the IDEA[.]" *Id.*

Once the IEP is developed, the school system must provide an appropriate educational placement that comports with the IEP.  *Alston v. Dist. of Columbia*, 439 F. Supp. 2d 86, 90 (D.D.C. 2006).  "If no suitable public school is available, the school system must pay the costs of sending

the child to an appropriate private school." *Dist. of Columbia v. Vinyard*, 901 F. Supp. 2d 77, 80–81 (D.D.C. 2012) (Kollar-Kotelly, J.) (quoting *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005)).  However, parents who "unilaterally" place a child with a disability in a private school, without consent of the school system, "do so at their own financial risk." *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (quoting *School Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1996)).  To qualify for tuition reimbursement under the IDEA, a plaintiff must demonstrate that (1) the school district failed to provide a FAPE, (2) the plaintiff's private placement was suitable, and (3) the equities warrant reimbursement for some or all of the cost of the child's private education. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-247 (2009).

**B. Factual Background**

**1. B.B.'s Education**

Plaintiff B.B. (herein referred to as "B.B." or the "Student") attended first grade in the Montgomery County, Maryland Public School system ("MCPS"), where he was diagnosed in 2016 as having an attention deficit disorder.  Administrative Record ("AR") at 69, 74.[5]  B.B. was later found eligible for special education, and in January 2017, he received an IEP that provided two hours per week of specialized instruction in reading (decoding/fluency), written expression, and math calculation in general education, and one and one-half hours weekly of specialized instruction in reading (decoding/fluency) outside of general education.  AR at 115.

---

[5] The 1773-page Administrative Record ("AR") herein is indexed at ECF No. 11 and docketed at ECF Nos. 11-17 (the attachments thereto).  The Court's references to the Administrative Record will cite to the page numbers (at the bottom left corner) assigned by the parties, while all pleadings cited herein will reference the page numbers assigned through the ECF system (at the top right corner).

B.B. continued attending public school in Montgomery County, and his second grade end-of-year 2017-2018 report card reflects that he received A's in art, physical education, and music, B's in science and social studies, and C's in math, reading and writing.  AR at 1616.  When B.B.'s IEP was updated in June 2018, he was deemed eligible for special education under the disability classification Specific Learning Disability – dyslexia, dysgraphia, dyscalculia.  AR at 123-124. B.B's IEP provided six hours per week of specialized instruction in reading decoding, phonemic awareness, comprehension and fluency, written expression, math calculation and problem solving, and executive functioning in general education, and three hours per week of reading, decoding, comprehension and fluency, phonemic awareness, and written expression outside of general education.  AR at 158.

B.B. started off the third grade, during the 2018-2019 School Year ("SY"), in a Montgomery County public school, but in November 2018, his mother withdrew him and enrolled him at the Lab School in Washington, D.C. ("the Lab School") so that he could receive full-time specialized instruction.  AR at 195, 325-42, 1157, 1203, 1345, 1357.   In January 2019, while the Student was attending the Lab School, Plaintiffs requested that DCPS evaluate B.B. for special education, determine eligibility, and provide a FAPE.  AR at 271, 323-4, 426-7, 1358.  On January 30, 2019, the Lab School created an IEP for B.B. that provided specialized instruction, speech language therapy, and occupational therapy ("OT") totaling 35 hours a week  AR at 325.  The IEP included goals in reading, written language, math, behavior/executive functioning, and OT.  AR at 330-337, 352-354.  On that same day, January 30, 2019, DCPS sent a letter of invitation to B.B.'s mother to discuss her concerns about B.B.'s speech language, attention, and academic concerns.  AR at 268.  On February 6, 2019, B.B.'s mother met with DCPS, and DCPS proposed evaluating B.B. before making determining eligibility and agreed to provide a comprehensive

psychological evaluation, speech language evaluation, occupational therapy valuation, motivational assessment scales, and a Strength and Difficulties questionnaire.  AR at 266, 362, 365, 377, 426-7.  B.B.'s mother signed a consent form to permit DCPS  to conduct all evaluations except for the psychological evaluation; she had already arranged for private psychological testing by Dr. Jaclyn Halpern, and she indicated that she would share those results.  AR at 262, 267, 426-7, 1361-2.  DCPS indicated that because B.B.'s mother had provided only a partial consent, it could not proceed with the evaluations, AR at 261, and DCPS attempted to secure Plaintiff's full consent.  AR at 277, 377-78.

In March 2019, Plaintiffs obtained Dr. Halpern's independent psychological evaluation indicating that B.B. suffers from ADHD Combined Type with related executive functioning weaknesses, and concluding that B.B. qualifies for special education under the disability category of SLD in reading, with mixed phonologic and orthographic dyslexia, in writing, with dyslexic dysgraphia, and in math, with dyscalculia.  AR at 401-403.  Dr. Halpern diagnosed B.B. with an Adjustment Disorder with Mixed Anxiety and Depressed Mood.  AR at 401-404.

On April 8, 2019, Plaintiffs submitted a second referral to DCPS for an initial evaluation of B.B.  AR at 428.  A multidisciplinary team met on May 1, 2019, and DCPS agreed to conduct a comprehensive psychological review, speech language pathology assessment, OT assessment, behavior motivational scales strengths/difficulties questionnaire, educational records review, and classroom observations.  AR at 429-430.   As part of the educational records review, B.B.'s Lab School end-of-year progress report indicated that the Student had started the year on the primer reading level and ended on a first-grade instructional level, and further, his confidence, overall mood and self-esteem had improved.  AR at 195-198, 1195-1196.

A classroom observation was conducted in May 2019; an OT and speech language assessment were administered in May 2019, and a motivational assessment scale and strength and difficulties questionnaire were provided to B.B.'s parent and teachers in June 2019 to rate B.B.'s behaviors. AR at 443, 444, 447, 458. With regard to the OT assessment, B.B. scored below average on Fine Motor Precision, Fine Motor Integration and Manual Dexterity subtests, and well below average on the Fine Manual Control Composite. AR at 452. On the speech/language assessment, B.B.'s standard scores ranged from average to above average and demonstrated an intact verbal expression system, AR at 478, and accordingly, the evaluation concluded that B.B. did not have a disabling oral communications disorder that could impact his ability to access the general education curriculum. AR at 480. The DCPS psychologist reviewed Dr. Halpern's report and found that B.B. was performing below age and grade expectations in oral reading, writing, and mathematics, and that he met the criteria for Other Health Impairment due to his ADHD. AR at 576-578. On June 26, 2019, DCPS held an IEP meeting and determined that B.B. was eligible for services as a student with multiple disabilities/SLD and other health impaired. AR at 484, 487, 495, 1365. The IEP team met subsequently on July 24, 2019, to create B.B.'s IEP. AR at 491, 495. The IEP provided 20 hours per week of specialized instruction, 3 hours per month of behavioral support services, and 4 hours per month of OT outside general education. AR at 515. The IEP provided goals in math, reading, written expression, emotional, social and behavioral development, and motor skills/physical development. AR at 498-514.

On August 1, 2019, B.B.'s mother received a Location of Services letter informing her that B.B.'s IEP would be implemented for the 2019-2020 school year at the Specific Learning Support ("SLS") program at Amidon-Bowen Elementary School ("Amidon-Bowen"). AR at 525, 1369-1370. On August 7, 2019, B.B.'s mother informed DCPS that B.B. would remain at Lab for the

2019-2020 school year.  AR at 526.  On September 20, 2019, Plaintiffs' educational consultant, Dr. Laura Solomon visited the Amidon-Bowen SLS classroom and observed a math lesson, AR at 1182-1185, and on October 2, 2019, B.B.'s mother observed the special education classroom at Amidon-Bowen.  AR at 1370-1372.  On October 10, 2019, DCPS observed B.B. in a math and reading intervention classroom at the Lab School.  AR at 605.  On January 20, 2020, the Lab School revised B.B.'s IEP, so that it provided 33.85 hours per week of specialized instruction, 45 minutes per week of OT, and 23.5 minutes per week of psychological services.  AR at 640.  That IEP provided goals in reading, written language, math, behavior/executive functioning, OT, and psychological services.  AR at 649-659.

### 2. Due Process Hearing

On February 19, 2020, Plaintiffs filed an administrative due process complaint challenging whether B.B. was denied a FAPE through DCPS's alleged failures: (1) to provide an appropriate IEP; (2) to provide an appropriate program; (3) to permit meaningful participation in the decision-making process regarding his educational placement; (4) to allow the Student's mother and her educational consultant to observe the general education classroom at the proposed placement; and (5) whether Lab is an appropriate placement.  AR at 661-678.  A due process hearing was held on May 4, 12, 19, and June 19 and 26, 2020 before Hearing Officer Coles B. Ruff, Esq.  AR at 9-38 (corrected HOD).  On Plaintiffs' side, in addition to testimony by B.B.'s mother, there was expert testimony from Dr. Laura Solomon, educational consultant; Dr. Jaclyn Halpern, psychologist; Courtney Heldman, Occupational Therapist; and July Shincarick, Associate Head of the Lab School Elementary Division and Director of Occupational Therapy.  AR at 35.  DCPS presented expert testimony from Shirley Hodges, psychologist; Trudianne James, special educator; Delisa Green, Speech/Language therapist; Dr. Veronique Moise, Occupational Therapist; Ashley

Fleischman, resolution specialist; Chrystal Towns Millington, manager of SLS classrooms; and Jennifer Fitzpatrick, instruction coach and teacher.  AR at 35-36.

The Hearing Officer issued a determination on July 8, 2020, finding that Petitioner failed to meet her burden of proof on all issues and denying all relief.  AR at 14, 22-31.  More specifically, in the HOD, the Hearing Officer concluded that: (1) the "level of specialized instruction both inside and outside general education that DCPS proposed for Student in the July 24, 2019 IEP was appropriate, and the IEP was reasonably calculated to enable Student to make progress appropriate in light of Student's circumstances;" (2) that "School B [Amidon-Bowen] could effectively implement the IEP that DCPS developed for Student on July 24, 2019, and could otherwise appropriately address the academic and social/emotional and other concerns noted in Student's evaluations and IEP;" (3) that "DCPS's action of selecting the school location where Student's IEP would be implemented did not impede Student's right to FAPE, or significantly impede Petitioner's opportunity to participate in the decision-making process regarding the provision of FAPE;" and (4) that "DCPS provided Petitioner and her educational advocate an adequate opportunity to visit and observe instruction at School B[.]"  *Id.* at 25, 27, 28, 30.  With regard to fifth and final issue, the Hearing Officer concluded that "despite the progress Student has made at School A [Lab], School A is not a placement that DCPS is obligated to fund" and therefore, the Hearing Officer did not grant reimbursement or prospective placement at the Lab School.  AR at 31.  The Hearing Officer noted that Respondent had the burden of persuasion on the first two issues, while Petitioner had the burden of production and persuasion on the remaining three issues.

Currently pending before this Court are the parties' cross-motions for summary judgment regarding whether Plaintiffs are entitled to tuition reimbursement for School Year 2019-2020 when B.B. was enrolled at the Lab School even though his placement was at Amidon-Bowen.

## II. LEGAL STANDARD

The IDEA requires that the school system offer an IEP that is reasonably calculated to enable a disabled student to make progress in light of his or her particular circumstances.  *See Endrew F.*, 137 S. Ct. at 992, 998-99; *cf. Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cty v. Rowley*, 458 U.S. 176, 188-89 (1982) ("According to the definitions contained in the Act, a 'free appropriate public education' [FAPE] consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction.").  The IDEA requires a federal court to "make an independent decision" based upon a "preponderance of the evidence" in determining whether a school system provided a student with a FAPE.  *Rowley*, 458 U.S. at 205-06.  "Courts sitting on an [IDEA] appeal do not have unfettered review but must . . . give due weight to the administrative proceedings and afford some deference to the expertise of the hearing officer and school officials responsible for the child's education."  *Gill v. District of Columbia*, 751 F. Supp. 2d 104, 108 (D.D.C. 2010) (citing *Lyons v. Smith*, 829 F. Supp. 414, 418 (D.D.C. 1993) (internal quotation marks omitted)).  Furthermore, "a hearing officer's findings 'based on credibility determinations of live witness testimony' are given 'particular deference' where there is no supplementation of the record."  *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76-77 (D.D.C. 2014) (citations omitted).

In contrast, "a hearing decision 'without reasoned and specific findings deserves little deference.'"  *Reid ex rel. Reid v. Dist. of Columbia,* 401 F. 3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. Superintendent D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991)) (internal quotation marks omitted); *see also M.O. v. Dist. of Columbia*, 20 F. Supp. 3d 31, 40 (D.D.C. 2013) ("[W]hile a certain amount of deference should be accorded to the knowledge and expertise of the hearing

officer, courts will accord less deference if the hearing officer's determination lacks reasoned and specific findings."); *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017) (explaining the 'some deference' is due to ALJ decisions, "but only when they are thorough and careful" which is neither ensured by the "duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion") (internal citations omitted). The party challenging the administrative decision carries the burden of proof of persuading the court that the Hearing Officer was wrong.  *Kerkam v. McKenzie*, 862 F.2d 884, 887 D.C. Cir. 1988); *Turner v. Dist. of Columbia*, 952 F. Supp. 2d 31, 35 (D.D.C. 2013) (same); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005) (finding that the burden of proof in an administrative hearing concerning an IEP is "upon the party seeking relief").

### III. ANALYSIS

Plaintiffs proffer three general arguments to support their claim that the Hearing Officer's findings in this case should be reversed.  First, Plaintiffs allege that the Hearing Officer erred in concluding that DCPS met its burden of proving that the IEP was appropriate to meet B.B.'s needs. Second, Plaintiffs allege that the Hearing Officer failed to properly weigh the evidence and made improper credibility determinations.  Third, Plaintiffs proffer that the Hearing Officer erred in finding that DCPS did not deny a FAPE based on lack of parental participation in the IEP process. These arguments will be addressed in turn.

### A. Appropriateness of the IEP

In *Endrew F.*, the Supreme Court concluded that an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 1001.  This standard is "markedly more demanding than the 'merely more than *de minimis*' test" that was applied by many courts.  *Id.* at 1000.  "The key inquiry regarding an IEP's

substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress" [and] . . . "that standard calls for evaluating an IEP as of the time each IEP was created rather than with the benefit of hindsight." *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018) (citing *Endrew F.*, 137 S. Ct. at 999) (quotation and internal quotation marks omitted).

In its Cross-Motion, DCPS summarizes some of the recommendations from B.B.'s assessments and evaluations that were available during the formulation of the IEP. Def.'s Cross-Mot., ECF No. 24, at 20-21. B.B.'s IEP provided for 20 hours a week of self-contained specialized instruction with the remaining time at school "spent in electives such as art and music, transitions to and from class and other locations, lunch, and recess [in a general education setting]." Def.'s Cross-Mot., ECF No. 24, at 21; *see* AR at 1529-1530. As previously noted, the IEP also included OT and behavioral support services. AR at 1536.

Plaintiffs challenge the IEP's inclusion of time in a general education setting on two alleged grounds: (1) the Hearing Officer relied exclusively on B.B.'s report card; (2) B.B.'s social and emotional needs could not be met in a general education setting; and (3) Plaintiffs assert further that the failure to provide a specific reading intervention was a denial of FAPE. The Court addresses each point below.

### 1. Reliance on B.B.'s Report Card

Plaintiffs argue that the Hearing Officer relied solely on B.B.'s report card from MCPS when he concluded that B.B. did not require support for classes such as art, music, or physical education, Pls.' Mot., ECF No. 23, at 20, and this ignores the "wealth of testimony from the parent's witnesses as to B.B.'s performance at Lab School and his need for support in all classes[.]"

*Id.* at 20-21.  Plaintiffs rely on *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 407 (5th Cir. 2012) (noting that "promotion from grade to grade is less indicative of a disabled student's receipt of FAPE where it appears that the student was promoted pursuant to a school policy rather than his achievement, where good grades are traceable to exemptions from standard expectations intended to circumvent rather than address his area of disability, and when independent evaluations contradict the amount of progress otherwise to be inferred from class promotion"), and Plaintiffs rely also on three cases cited in *Klein*.  As a preliminary matter, Defendant notes that the cases cited by Plaintiffs are from the dissenting opinion in *Klein*, *id.* at 407, while the "majority opinion concluded that the IEPs were adequate to confer a FAPE and reversed judgment of the district court."  Def.'s Cross-Mot., ECF No. 24, at 23 (citing *Klein*, 690 F. 3d at 400).  Furthermore, Defendant distinguishes the cases cited in *Klein* insofar as there is "no evidence that B.B.'s teachers [at MCPS] inflated his grades" or that there was a "school district . . .  policy of not retaining students at a particular grade level." Def.'s Cross-Mot., ECF No. 24, at 23; *see id.* (discussing the three cases cited by Plaintiffs).[6]

 Moreover, in this case, "the only evidence available to the IHO from MCPS to show how B.B. performed in general education is the report card."  Def.'s Cross-Mot., ECF No. 24, at 23; *see* AR at 24-25 ("The only documentary evidence of how Student is likely to function in such

--------

[6]  The Court notes that B.B.'s second grade end-of-year 2017-2018 report card reflected a distinction in his grades depending on the subject matter: he received A's in art, physical education, and music, B's in science and social studies, and C's in math, reading and writing.  AR at 1616

classes with general education students is the report card that Student had while attending

MCPS.")[7] The Hearing Officer explained that:

> At School A, Student is with no general education students. And neither of the witnesses
> from School A who testified on Petitioner's behalf had ever observed Student in any
> general education setting. The only evidence presented that reflects Student's time and
> performance in a general education setting was when Student attended MCPS. Although
> Petitioner and her consultant testified that Student struggled while in MCPS, neither of
> them could effectively explain how Student could have received passing grades while in
> MCPS and obtained excellent grades in all special non-academic courses. Neither of them
> observed Student in those classes at MCPS.

AR at 24.

Accordingly, it is clear that the Hearing Officer considered not only B.B.'s report card —

which indicated A grades in art, physical education, and music (as opposed to other subjects) while

B.B. was in general education classes — but he also considered the testimony of Plaintiffs'

witnesses, although he found that testimony to be lacking. For example, Plaintiffs' witness, Ms.

Heldman, noted that B.B. "had improved in his confidence and so he's taken more of a leadership

role in physical education ("PE") class, whereas earlier because of his poor motor skills and his

low strength, he had been less inclined to participate in PE class and now he feels more comfortable

and confident." AR at 1275. This testimony fails however to illustrate any special education

supports provided during PE and/or how such supports resulted in this progress.

Defendant summarizes cogently some of the weaknesses in Plaintiffs' argument:

> First, none of the witnesses from Lab had observed B.B. in a general education setting.
> AR at 24. Indeed, Plaintiff L.E.E. admitted that she never observed B.B. in the
> classroom at MCPS, and that her information about B.B.'s abilities in art, physical
> education, and music came from B.B., not from his teachers. AR at 1352-1353, 1381.
> Second, the HOD found Dr. Solomon's testimony that B.B. needed specialized

---

[7] Plaintiffs argue against the use of this phrase "likely to function," but reading the HOD
puts it in the appropriate context of whether B.B. can "effectively interact with general education
students" during lunch, recess, and specials. AR at 24.

> instruction during lunch and recess "unbelievable" because there was no evidence that
> B.B. could not effectively interact with his non-disabled peers during lunch and recess.
> AR at 24.

Def.'s Cross-Mot., ECF No. 24, at 24; *see* AR at 24 ("Although Petitioner's consultant

asserted that Student would need specialized instruction during lunch and recess and testified that

she stated that during the IEP meeting, this portion of her testimony was unbelievable.  There is

no evidence that Student currently receives specialized instruction during lunch and recess at

School A.  There is no indication that Student cannot effectively interact with general education

students during lunch and recess, which would presumably be an hour of Student's school day in

DCPS.")

In contrast, DCPS witness Ms. James testified that she observed B.B. at the Lab School as

he made transitions between homeroom and elsewhere and from one activity to another in a

separate class, and he did not require any supports.  AR at 1531.  Ms. James also observed the Lab

School during lunch and recess, and she never saw any specialized instruction occurring. AR at

1533.  Similarly, DCPS witness Ms. Moise testified that she had visited the Lab School

approximately 15 times over the past two years and never saw special instruction during recess.

AR at 1603.  Ms. Moise testified further that BB did need OT during recess because he had average

ball skills and did not tend to trip or fall.  *Id.*  The Hearing Officer concluded that B.B.'s report

card was the only documentary evidence in the record that illustrated B.B.'s performance in a

general education setting.  The Hearing Officer considered also testimony on behalf of both

Plaintiffs and Defendants regarding this issue, although some such testimony was rejected by him.

Accordingly, this Court finds that Plaintiffs' claim that the Hearing Officer improperly relied on

B.B.'s report card lacks merit.

### 2. B.B.'s Social and Emotional Needs

Plaintiffs challenge the Hearing Officer's conclusion that B.B. can "attend lunch and recess in the mainstream setting without any special education support," on grounds that this ignores B.B.'s social and emotional needs.  Pls.' Mot., ECF No. 23, at 26.  Plaintiffs assert that, pursuant to 34 C.F.R. § 300.114, "a student should be educated with his or her nondisabled peers to the maximum extent **appropriate**."  *Id.* (emphasis added by Plaintiffs), but Plaintiffs' highlighting of the word "appropriate" ignores the focus on educating a student with his nondisabled peers to the maximum extent.  Plaintiffs argue that "appropriate  educational services certainly include a student's social and emotional needs."  Pls.' Mot., ECF No. 23, at 26.  In fact, the Hearing Officer examined this issue of lunchtime and recess supports, in light of *Endrew F.*, where an IEP "must be appropriately ambitious in light of [the student's] circumstances," 137 S. Ct. at 992, and the IEP must "set out a plan for pursuing academic and functional advancement." *Id.* at 999.

Plaintiffs rely on testimony by several witnesses to support their claim that B.B.'s social and emotional needs were ignored by the Hearing Officer.  First, Plaintiffs contend that Dr. Halpern indicated that B.B. had anxiety; he was "uncomfortable around his peers" and worried about being "negatively judged," and accordingly, based on "her findings regarding his social/emotional needs, *in addition to his significant academic and attentional needs*," Pls.' Mot., ECF No. 23, at 28 (emphasis added by the Court), she recommended full-time special education as the least restrictive environment.  AR at 1233-1234; *see also* Pls.' Mot., ECF No. 23, at 29 (noting Ms. Shincarick's statement that in a larger, nonspecial education "setting where there would not be the structure that we have, [B.B.] would get lost, he possibly would get teased.") (citing AR 1312-1313).  Defendant notes that "Plaintiffs' dire predictions of what might happen to B.B. in a general education setting lose sight of the fact that *four hours* of each school day would

16

have been spent in the self-contained classroom."  Def.'s Reply, ECF No. 32 at 8 (emphasis in original).  Furthermore, "[o]nly *one hour* of each school day would have been spent in an elective class such as art or music with non-disabled peers. The remaining *one hour* of the school day would have been spent at lunch, in recess, and in transitions from class to class." *Id.* at 8-9.

Plaintiffs argue further that Ms. Shincarick's testimony that Plaintiff needs "extra support out on the playground" and her description of Plaintiff's "difficulty on the playground" demonstrate the "support and instruction that B.B. receives at recess in order to participate." Pls.' Mot., ECF No. 23 at 28-29; *see* AR at 1209, 1215, 1312-1313.  However, Defendant asserts – and this Court agrees – that Ms. Shincarick's testimony fails to describe any support that was *received by B.B.* during recess.  Def.'s Cross-Mot., ECF No. 24, at 26.

Plaintiffs assert next that the Hearing Officer used a "more limited view of the meaning of special education services" when he suggested that services were not provided during recess or lunch at the Lab School.  Pls.' Mot., ECF No. 23, at 29.  Plaintiffs' argument is not crystal clear, but they appear to focus on the fact that "special education services" go beyond academics and may be warranted despite a child's good grades and academic performance.  *Id.* at 31 (citing *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369 (8th Cir. 1996)); *see also Town of Burlington v. Dep't of Educ. for the Commonwealth of Mass.*, 736 F.2d 773, 790 (1st Cir. 1984).  Defendant argues however that while Plaintiffs "take exception to the IHO's use of the term 'specialized instruction,'" whether the Hearing Officer used the term "special education" or "specialized instruction" does not matter because there is no evidence that his use revealed a more limited view

of special education.  Def.'s Cross-Mot., ECF No. 24, at 26.[8]  Moreover, Plaintiffs have not

presented evidence of special education or specialized instruction *received* by B.B. either during

recess or lunch while at Lab; instead; rather, they reference generally that "specialists [were]

watching and managing his behavior [all day]" and there was "structure [at the Lab School]"  AR

at 1312-1313.  This Court notes that similarly, at Amidon-Bowen, "[d]uring lunch and recess,

students are monitored by teachers, paraprofessionals, and several other adults."  AR at 1693.

Additionally with regard to the Student's social and emotional needs, Defendant highlights

the IEP, which includes "three goals in emotional, social and behavioral development."  Def.'s

Cross-Mot., ECF No. 24, at 25-26 (explaining those goals).  The IEP "also provides three hours

per month of behavior support services outside of general education, and a social support group to

help B.B. feel less alone in his struggles."  AR at 515-516.  Defendant notes that the "source of

B.B.'s social and emotional needs as reflected on B.B.'s July 2019 IEP came from Dr. Halpern's

psychological evaluation, the Lab IEP, and B.B.'s parents."  Def.'s Reply, ECF No. 32, at 7; AR

at 511-512.  Furthermore, the "Other Classroom Aids and Services" section of the IEP addresses

also B.B.'s social and emotional needs.  Def.'s Reply, ECF No. 32, at 7; AR at 516.

In their Reply, Plaintiffs assert that the Lab School holds a "certificate of approval from

the Office of State Superintendent of Education to provide full-time special education services to

D.C. students" and accordingly, "this includes lunch and recess."  Pls.' Reply, ECF No. 29, at 15.

---

[8] Plaintiffs assert that the IDEA does not define "specialized instruction," and in Plaintiffs' view: "'[s]pecially designed instruction means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction,' to meet the unique needs and provide access to the general education setting."  Pls.' Reply, ECF No. 29, at 16 (quoting 34 C.F.R. §300.39(b)(3)).  Plaintiffs assert that "[t]his is precisely what the Lab School does in all of its classes, including lunch and recess," *id.* at 16, but this generalized statement lacks specific support.

Plaintiffs' argument is nonsensical as the certificate itself is not proof of services actually provided to the students.  Considering the record in this case as highlighted in the parties' arguments, this Court finds that the Hearing Officer's conclusion that Plaintiff can attend lunch and recess in a setting with general education students is supported by the record, and accordingly, Plaintiffs' claim that the Hearing Officer did not consider the Student's social and emotional needs is denied.

### 3. Non-Inclusion of a Specific Reading Intervention

The Supreme Court has held that educational methodologies are generally left to the discretion of school districts in cooperation with the parents of a student.  *Rowley*, 458 U.S. at 208; *id.* at 207 (noting that "courts must be careful to avoid imposing their view of preferable educational methods upon the States").  There is nothing in the IDEA that requires an IEP to include specific instructional methodologies, but an IEP team may determine whether a specific methodology is included in an IEP.  71 Fed. Reg. 46, 665 (2006), 34 CFR 300.320 (d)(1)); *see also S.M. and G.M. v. State of Hawaii, Dep't of Educ.*, 808 F. Supp 2d 1269, 1278 (D. Hawaii 2011) (determining that a child's IEP was not required to specify what methodology his school would use).  If a child requires a specific educational methodology, a district may be liable for denial of FAPE if they refuse to include it in the IEP.  *See R.B. ex rel. D.B. v. New York City Dep't of Educ.*, 589 F. App'x 572, 576 (2d Cir. 2014).  Here, the Hearing Officer found that "[t]he IEP meeting notes do not reflect that during the IEP meeting, there was any mention of or request for any specific reading methodology or intervention program to be included in the IEP."  AR at 23. Accordingly, in the instant case, there is no evidence to suggest that Plaintiffs requested a specific reading methodology for B.B., and therefore, "the methodology to be employed in the future execution of an IEP is not a question for courts to decide." *R.B. v. District of Columbia*, No. 18-cv-662 (RMC), 2019 WL 4750410, at *13 (D.D.C. Sept. 30, 2019).

Plaintiffs argue that B.B.'s IEP is inappropriate because it did not include a specific reading methodology. Plaintiffs allege that "[h]ere, not only is no specific reading intervention named, but it is not clear that any reading intervention at all would have been provided by DCPS." Pls.' Mot., ECF No. 23, at 31. Plaintiffs argue that the "recommendation that B.B. receive a specific reading intervention, namely Orton-Gillingham, has been consistent for years," and this is what he receives at the La School. Pls.' Mot., ECF No. 23, at 33-34. Plaintiffs assert that the school system was presented with documentation that "clearly indicated that B.B. required a specific reading intervention." *Id.* at 34. Plaintiffs put the onus on the school system to not only consider the information provided by parents but to affirmatively evaluate the child. Pls.' Mot., ECF No. 23, at 34 (citing *Z.B. v. District of Columbia,* 888 F.3d 515, 524-525 (D.C. Cir. 2018)). Defendant distinguishes *Z.B.* on grounds that the school district there "did not conduct its own evaluations despite the student's evident disabilities," and it relied on the parent's information to develop the IEP, whereas in this case, DCPS "conducted its own evaluations, is aware of B.B.'s disabilities, and has several reading interventions in place to assist B.B." Def.'s Cross-Mot., ECF No. 24, at 28.

Defendant explains that "the MDT considered B.B.'s recent evaluations in developing the July 2019 IEP," and furthermore, "Dr. Halpern's input is prominently featured throughout the IEP." Def.'s Cross-Mot., ECF No. 24, at 27. "DCPS was aware that B.B. had difficulties with phonemic awareness, sight word development, reading comprehension, and oral reading fluency, and the IEP goals addressed those difficulties." *Id.; see* AR at 502-505. Moreover, during the hearing, Ms. Fitzpatrick testified about the reading interventions [other than Orton-Gillingham] available at Amidon-Bowen. Def's Cross-Mot, ECF No 24, at 27-28. Defendant notes also that while Plaintiffs' witnesses testified that the Lab School used the Orton-Gillingham reading

20

intervention, "they did not testify that B.B. *requires* Orton-Gillingham because it is the *only* intervention that would be effective for B.B." Def.'s Cross-Mot. ECF No. 24, at 29 (emphasis in original).

In their Reply, Plaintiffs assert that B.B. is a student who falls within the circumstances in which a particular teaching methodology is an integral part of what is individualized about the student's education, and those circumstances will "need to be discussed at the IEP meeting and incorporated into the student's IEP." Pls.' Reply, ECF No. 29, at 18. Plaintiffs' generalized assertion is unpersuasive and furthermore, the Hearing Officer has noted that there is no indication that a reading methodology was discussed at the IEP meeting. Defendant reiterates that "Plaintiffs *never* requested that a specific reading intervention be included in the IEP," Def.'s Reply, ECF No. 32, at 9, and Plaintiffs do not deny that fact. Furthermore, Plaintiffs have not "articulated why B.B. needs Orton-Gillingham and why the numerous reading interventions available at Amidon-Bowen would not also benefit B.B." *Id.* In light of the record in this case, this Court upholds the Hearing Officer's determination that B.B. was provided sufficient reading intervention and there was no denial of FAPE. Accordingly, Plaintiffs' challenge in this regard is denied.

### B. Weight of the Evidence and Credibility Determinations by the Hearing Officer

Plaintiffs argue that the Hearing Officer failed to properly weigh evidence and made improper credibility determinations when he allegedly: (1) afforded total deference to the DCPS witnesses while ignoring Plaintiffs' Witnesses; (2) failed to give appropriate weight to Plaintiffs' experts; and (3) failed to consider that the DCPS witnesses proffered responses that were neither cogent nor responsive. The first two points will be addressed together as they are interrelated.

21

**1. Deference to Witnesses and Weight of Expert Testimony**

A hearing officer in an IDEA administrative proceeding is the trier of fact and responsible for determining how much weight to give to the evidence, including witnesses. *A.I. ex rel. Iapalucci v. District of Columbia*, 402 F. Supp. 2d 152, 170 (D.D.C. 2005). Hearing Officers have the "opportunity to hear testimony in person, examine the demeanor of the witness and reactions of the participants, and can bring immeasurable experience and expertise in this specialized area." *Id.* at 170. Findings "based on credibility determinations of live witness testimony" are given "particular deference." *McAllister v. District of Columbia*, 45 F. Supp. 3d 72, 76 (D.D.C. 2014); *see also Wimbish v. District of Columbia*, 381 F. Supp. 3d 22, 29 n.5 (D.D.C. 2019) ("It is undisputed that a hearing officer is entitled to make reasonable credibility determinations and, in the absence of extrinsic evidence to the contrary, those determinations are entitled to deference from the Court.") (internal quotation marks and alterations omitted); *accord Fullmore v. District of Columbia*, Case No. 13-cv-00409 (CRC), 2016 WL 1254208, at *1 (D.D.C. Mar. 29, 2016) ("The Court may not substitute its own views for those of the Hearing Officer[.]") (quotation omitted).

Plaintiffs assert that the Hearing Officer gave complete deference to the DCPS witnesses, while the law requires that the "selection of IEP and educational placements must be made pursuant to both input from the parent and the "expertise and the exercise of judgment by school authorities." Pls.' Mot., ECF No. 23, at 35 (citing *Endrew F.*, 137 S. Ct. at 1001). Plaintiffs point to nothing specific in the administrative record to support their assertions. In contrast, Defendant points to numerous findings of fact by the Hearing Officer that were based on the testimony of Plaintiffs' witnesses. *See* AR at 14-21 (Findings of Fact 2, 6, 13, 19, 28, 31, 32, 35, 57).

Plaintiffs allege generally that the Hearing Officer failed to discuss any weighing of the evidence, which resulted in "a hearing decision without reasoned and specific findings [that] deserves little deference." Pls.' Mot., ECF No. 23, at 36 (quoting *Turner*, 952 F. Supp. 2d at 36) (quotation omitted); *see M.O. v. District of Columbia*, 20 F. Supp. 3d 31, 41 (D.D.C. 2013) ("the hearing officer's determination does little to address the concerns raised by [plaintiffs' educational] professionals," because "there was no discussion of the adequacy of the District's consideration of the recommendations, or why the District's review of the evaluations was credited over those of the plaintiffs' witnesses"); *see also Options Pub. Charter Sch. v. Howe es rel. A.H.,* 512 F. Supp. 2d 55, 57-58 (D.D.C. 2007) (reversing and remanding IDEA action for further administrative proceedings where the hearing officer made "no findings with respect to the basis upon which she credited . . . testimony" and elsewhere . . . relie[d] upon speculation").

In contrast to *M.O.*, however, the Hearing Officer in the instant case did consider Plaintiffs' witness testimony, and it is referenced throughout his analysis in the HOD: "Petitioner and her representatives and the School A staff believed Student should have an IEP that proposed all services outside general education," AR at 23; "Petitioner asserts that Student should thus have specialized instruction during lunch and recess and all classes," AR at 24; "Petitioner and her consultant testified that Student struggled while in MCPS." *Id.* Similarly, this Court finds this case inapposite to *Options Public Charter School* as the Hearing Officer here did make findings where he credited some testimony and found other testimony to be speculation. For example, when discussing how Student might function in general education art and music special classes, the Hearing Officer noted that "[t]here was no credible testimony that disputed this [documentary] evidence of Student's ability to function successfully in those classes with general education students." AR at 25.

Defendant contends that Plaintiffs' claim that the Hearing Officer "failed to weigh the evidence" is "baseless." Def.'s Cross-Motion, ECF No. 24, at 33.  A review of the HOD shows several circumstances where the Hearing Officer did weigh the evidence.  First, he weighed documentary evidence regarding B.B.'s performance in music, art, and physical education against testimony of those who said he would not do well in general education for these specials, despite that none of them had ever observed him in a general education setting.  AR at 24.  Second, the Hearing Officer weighed testimony from Dr. Solomon regarding B.B.'s alleged need for special education during lunch and recess versus lack of evidence of specialized instruction being performed then.[9]  *Id.*  Third, the Hearing Officer weighed the testimony by Dr. Solomon that B.B. would not be able to do what other students did in the SLS classroom versus testimony by DCPS witnesses who discussed the make-up, resources, and interventions available in SLS classrooms.  AR at 26-27.  Defendant concludes therefore that Plaintiffs proffer no good reasons for the Court to stray from the principle that a "District Court must accept the [hearing officer's] credibility determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion."  *J.N. v. District of Columbia*, 677 F. Supp. 2d 314, 322 (D.D.C. 2010) (quotation omitted) (emphasis in original).  The Court finds that the record reflects that the Hearing Officer balanced the testimony of Plaintiffs' witnesses against opposing testimony and/or documentary evidence, and he indicated when he gave more deference to one over the other.  Accordingly, this Court finds that the Hearing Officer's reasonable credibility determinations are entitled to

---

[9] The Hearing Officer found that Dr. Solomon's testimony that B.B. needed special education during lunch was "unbelievable" because of the lack of evidence in the record that B.B. received specialized instruction during lunch.  AR at 23 (emphasis added).

deference, and Plaintiffs' arguments against upholding the HOD – based on the Hearing Officer's alleged improper weighing of evidence and witness deference – are denied.

### 2. Cogent and Responsive Statements By DCPS Witnesses

Plaintiffs assert that DCPS witnesses such as Trudianne James should have been given "no weight or deference" because she "only observed B.B. one time" and "had not spoken to any professionals outside of the Lab School, never worked with or educated B.B., and had not evaluated him."  Pls.' Mot., ECF No. 23, at 40.  Plaintiffs contend that there were other DCPS witnesses who had "minimal first-hand knowledge of B.B," *id.* at 41, but this statement totally ignores the subject matter on which the witnesses were testifying.[10]  And it ignores that DCPS witnesses Ms. Moise and Ms. Green "both evaluated B.B." and "[b]oth of their evaluations included a records review, interviews with B.B.'s parents and teachers, and observations."  Def.'s Reply, ECF No. 32, at 3; *see* AR at 448-449, 458-460.  Plaintiffs assert also that "Ms. James' [verbal] attack on the parent and her experts [which was] *without any basis*."  Pls' Mot., ECF No. 23, at 40.  The Court notes that while the Hearing Officer did reference the testimony of some of Defendant's witnesses in his findings of fact, there is no indication in the record that any alleged inflammatory statements made by Ms. James swayed the opinion of the Hearing Officer.

---

[10] *See generally* Def.'s Cross-Mot., ECF No. 24, at 30-31 (describing DCPS witness testimony).  For example, Plaintiffs challenge DCPS witness Ashley Fleischmann because she "had no firsthand knowledge of B.B. and no expertise in education."  Pls.' Mot., ECF No. 23, at 41.  In its Cross-Motion, ECF No. 24, at 31, Defendant indicates that Ms. Fleischmann testified that she "accompanied Plaintiff and Dr. Solomon when they visited Amidon-Bowen separately for classroom observations," AR at 1629-1630, and in both classrooms "the students were separated into three groups with one group working on computers, a second group working at a u-shaped table, and a third group working with paraprofessionals."  AR at 1633.

Plaintiffs rely on language from *Endrew F.*, 137 S. Ct. 988, 1001-1002, where the Court indicated that "[a] reviewing court may fairly expect [ ] authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances."  Pls.' Reply, ECF No. 29, at 8.  Plaintiffs surmise generally that because "no such explanation was provided during the IEP process, or at any time since including the Due Process Hearing, [t]he only logical conclusion is that less deference should be afforded the school system witnesses."  *Id.*  While Plaintiffs argue that their witnesses deserved more weight and deference than Defendant's witnesses, they cite neither case law nor statutory support for this principle.  "Instead, they seem to argue that the hearing officer misapplied the burden of proof whenever he discounted evidence favorable to plaintiffs or cited evidence unfavorable to plaintiffs."  *Schoenbach v. District of Columbia*, 309 F. Supp. 2d 71, 79 (D.D.C. 2004) (rejecting argument that HOD was erroneous to the extent that it gave any weight to DCPS's witnesses where plaintiffs claimed such witnesses were "incompetent" to testify).  Plaintiffs' argument that the DCPS witnesses were not cogent or responsive is not supported by the record in this case, and furthermore, there is no evidence that blind deference was accorded to these witnesses by the Hearing Officer.  Accordingly, the Court hereby denies all of Plaintiffs' "weight of evidence" and "credibility" challenges to the Hearing Officer's HOD.

### C. Parental Participation in the IEP Process

Plaintiffs allege that B.B.'s mother was denied a right to meaningful participation in the IEP process "when [DCPS] failed to provide placement information at B.B.'s IEP meeting and

then denied the parental request to observe a general education classroom."  Pls.' Mot., ECF No. 23, at 42.[11]

### 1. Provision of Placement Information

"The IDEA requires that the parents be part of the team that creates the IEP and determines the educational placement of the child. . . . These statutory provisions do not, however, explicitly require parental participation in site selection. 'Educational placement', . . .  means educational program [as opposed to] the particular institution where that program is implemented."  *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009); *D.K. v. District of Columbia*, 983 F. Supp. 2d 138, 145 (D.D.C. 2013); *Johnson v. District of Columbia*, 839 F. Supp. 2d 173, 178 (D.D.C. 2012); 34 C.F.R. § 300.116(a) (requiring that the placement decision be based on a child's IEP and "made by a group of persons, including the parents. . ."); 34 C.F.R. § 300.513(a)(2)(ii) ("in matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies . . . significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child").

 Plaintiffs cite no case law or statutory law to the contrary.  Accordingly, this Court finds that Plaintiffs' claim that they were denied meaningful participation because of Defendant's failure to provide placement information at the IEP meeting is without merit.

---

[11] Both the Defendant and the Hearing Officer explain in detail how the Plaintiff and her representatives were provided with a full opportunity to contribute to the Student's IEP.  *See* Def.'s Cross-Mot., ECF No. 24, at 35-36; AR at 27-28.

### 2. Observation of Educational Program

The right of a parent and his/her designees to observe a proposed special education program is detailed in D.C. Code § 38-2571.03(5). More specifically, a parent or "designee appointed by a parent with a disability who has professional expertise in special education" shall be permitted to view the "setting where the child's instruction will occur if the child attends the proposed program[.]" D.C. Code § 38-2571.03(5)(A)(ii) & (C). The local education agency ("LEA") "shall not impose any conditions or restrictions on such observations except those necessary" to ensure children's safety and privacy and avoid disruptions in the classroom. D.C. Code § 38-2571.03(5)(D)(i)-(iii).

According to Plaintiffs, "[b]oth the parent and her educational consultant requested permission to observe the program proposed for B.B., including the general education classroom setting at Amidon-Bowen [but] DCPS refused." Pls.' Mot., ECF No. 23, at 43. Plaintiffs' statement is somewhat misleading. In this case, the Hearing Officer explained that:

> The evidence demonstrates that Petitioner and her consultant were allowed to visit [Amidon-Bowen] and to observe the SLS program that Student would have attended if Petitioner chose to enroll Student at School B. She and her educational consultant requested to see the general education setting but were not allowed to see a general education classroom during the visit. However, there is no indication that Petitioner or her consultant were denied the opportunity to visit other parts of the school, like the cafeteria, the gym, or other locations in the building where Student would have spent the school day.
>
> Although Student's full educational program would have included some contact with general education students, what classes other than the SLS class [were] not defined at the time of Petitioner's visit. That choice would have been made had Student enrolled.

AR at 30. The Hearing Officer concluded that there was "adequate opportunity to visit and observe instruction at [Amidon-Bowen] [a]nd the fact that t[the mother and educational consultant] did not get to see a general education classroom during that visit did not impede Student's right to FAPE,

28

or significantly impede Petitioner's opportunity to participate in the decision-making process regarding the provision of FAPE [.]"  AR at 30.

Defendant asserts that Plaintiffs had the opportunity to observe the "proposed *special education program,*" which was "the SLS classroom at Amidon-Bowen," and "[b]oth Plaintiff and Dr. Solomon observed the SLS classroom," so there was no denial of FAPE.  Def.'s Cross-Mot., ECF No. 24, at 37.  Plaintiffs disagree with Defendant's this interpretation of the statute, *see* Pls.' Reply, ECF No. 29, at 19-20, but they provide no legal support for their argument that being refused the right to observe a *general education* classroom equates to a denial of FAPE, when they were permitted to observe a *special education* classroom and areas such as the gym and cafeteria.[12]  Plaintiffs argue further that "DCPS refused to answer their questions,"  Pls.' Reply, ECF No. 29, at 19, although they admit that there were Q & A sessions.  Accordingly, this Court agrees with the Hearing Officer that the failure to be permitted to visit a general education classroom does not denote a denial of FAPE, when the Plaintiff was permitted to visit a special education classroom where the Student would be spending the majority of his time.

**D. B.B.'s Placement**

The Hearing Officer considered whether Lab School is a placement that must be funded by Defendant and concluded that it was not.  AR at 30-31.  A student's IEP determines whether an educational placement is appropriate; the placement does not dictate the IEP.  *See Roark v. District*

---

[12] Plaintiff alleges that she was "unable to make [a decision about attending Amidon-Bowen] based on her lack of information [due to lack of observation]."  Pls. Mot., ECF No. 23, at 43-44.  The Court questions the sincerity of this allegation as B.B.'s mother informed DCPS on August 7, 2019, that B.B. would remain at the Lab School for the 2019-2020 school year.  AR at 526.  The educational consultant did not visit Amidon-Bowen until September 2019, and the mother visited in October.  *See* AR at 1182-1185, 1370-1372.

*of Columbia*, 460 F. Supp. 2d 32, 44 (D.D.C. 2006); *Spielberg by Spielberg v. Henrico Cty. Public Sch.*, 853 F.2d 256, 258 (4th Cir. 1988) ("Educational placement is based on the IEP, which is revised annually.") In this case, Plaintiffs challenged the IEP on several grounds.  The Hearing Officer found ultimately that "there was sufficient evidence that the IEP DCPS proposed for Student for SY 2019-2020 was reasonably calculated to enable [B.B.] to make progress in light of [his] circumstances[.]"  AR at 31.  Subsequently, this Court analyzed Plaintiffs' challenges to the IEP at length and ultimately rejected them.  *See* Section III.A. herein.

"The IDEA requires school districts to offer placement in a school that can fulfill the requirements set forth in the student's IEP [and while] [t]he school need not perfectly satisfy the IEP, [it] cannot commit a material failure, or leave more than a minor discrepancy between the services . . . provide[d] . . . and the services required [.]"  *N.W. v. District of Columbia*, 253 F. Supp. 3d 5 (D.D.C. 2017) (quotations and internal quotation marks omitted).  Neither the Hearing Officer nor the District disputes that B.B. was receiving an educational benefit at the Lab School.  *See* AR 31 ("Albeit the evidence demonstrates that since Students has attended [the Lab School], Student has made progress and that Petitioner is pleased with and wants Student to remain at [the Lab School].");  Def.'s Cross-Mot., ECF No. 24, at 37-38 ("The District does not dispute that B.B. was receiving an educational benefit at Lab [b]ut placement at a private school such as Lab is not required for B.B. to achieve academic success.")  The Hearing Officer found that "there was sufficient evidence that the IEP could be implemented at [Amidon-Bowen] and that [Amidon-Bowen] was an appropriate placement."  AR at 31. Furthermore, no denial of FAPE was found by the Hearing Officer or this Court.  Accordingly, Plaintiffs are not entitled to reimbursement for placement at the Lab School because parents who unilaterally decide to place their disabled child in a private school, without obtaining the consent of local school officials, "do so at their own

financial risk." *Florence County Sch. District Four v. Carter*, 510 U.S. 7, 15 (1993) (quoting *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373-374 (1985)).

## IV. CONCLUSION

Having examined each of the grounds asserted by Plaintiffs in their challenges to the Hearing Officer's Determination, this Court finds that none of these challenges warrant reversal of the Hearing Officer's conclusion that there was no denial of FAPE.  Because Plaintiffs have not been able to establish a denial of FAPE, which is the first of three prongs to qualify for tuition reimbursement, *see Forest Grove Sch. District.*, 557 U.S. at 247, Plaintiffs' claim for reimbursement for tuition at the Lab School for School Year 2019-2020 is denied, and summary judgment shall be granted in favor of Defendant.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE